## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

P.I.M.L., Inc., a Florida
corporation,

              Plaintiff,

     v.                         **Memorandum of Law and Order**
                                 Civil File No.04-3041 (MJD/SRN)

Fashion Links, LLC, a Connecticut
corporation, Chain Link Graphix, LLC,
a Virginia corporation, Chain Link Graphix,
Inc., a Virginia corporation, Edwin W. Davidson,
Christopher J. Hilburn, and John D. McKelvey,

              Defendants.


_____

D. Clay Taylor, counsel for P.I.M.L.

Aaron W. Davis, Patterson, Thuente, Skaar & Christensen, P.A., counsel for
Fashion Links, LLC, Edwin W. Davidson, and John D. McKelvey.

Andrea F. Rubenstein, Hedin & Glidden, P.A., counsel for Chain Link Graphix,
LLC, Chain Link Graphix, Inc., and Christopher J. Hilburn.


_____


## I.   INTRODUCTION

    This case is before the Court on the motions by all defendants for summary

judgment on Plaintiff P.I.M.L.'s claims for breach of contract, violations of

Minnesota Statute §181.145, and quantum meruit.  The Court heard oral

arguments on February 3, 2006.

## II.    FACTUAL BACKGROUND

Since this case is before the Court on Defendants' motion for summary

judgment, "the inferences to be drawn from the underlying facts . . . must be

viewed in the light most favorable to the party opposing the motion." <u>Matsushita</u>

<u>Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  Thus, for

purposes of this motion only, the Court will construe the facts in the light most

favorable to Plaintiff.

### A.    <u>The Parties and Their Backgrounds</u>

All parties to this lawsuit are in the fashion industry.  Plaintiff, P.I.M.L., is an

independent sales agency working for manufacturers and importers of apparel.

Daniel J. Welch is the President of P.I.M.L.

Defendant, Fashion Links, LLC is an importer/manufacturer of various

apparel products.  Fashion Links, LLC's registered owners are Ned Davidson and

John McKelvey.

Defendant, Chain Link Graphix, Inc., designs, obtains from manufacturers

and sells apparel products.  Chris Hilburn is Chain Link Graphix, Inc.'s principal

shareholder and president.

### B.    <u>The Relationship Between Fashion Links and Chain Link</u>

Sometime in early 2002, Davidson, McKelvey, Hilburn, and a man named

Rohit Podar began discussions about a business they intended to form.  The

business, generically known as Fashion Links, would import and sell custom

designed t-shirts and casual apparel to retail stores across the United States.

Although Fashion Links did not incorporate until September 15, 2003, the group

worked together and completed some sales before that time.  (Welch Ex. 35.)

### C.   Commission Agreement

Welch's employment relationship with Defendants began in the spring of

2002.  Who, exactly, employed Welch remains contested as the companies did not

sign any written agreement.  Hilburn recruited Welch, whom he had known and

worked with for over fifteen years.  Welch was hired to act as an independent

sales representative for the newly formed entity called Fashion Links.  The generic

name, Fashion Links, encompassed Hilburn's Chain Link Graphix and all Fashion

Links entities.[1]  Welch traveled to Connecticut to interview with the founding

members of Fashion Links.

Welch and Hilburn discussed terms of their employment relationship and an

oral agreement was reached.  According to Welch, the parties agreed that he

would receive a 5% commission for all sales.  Following this meeting, Welch sent

an email to Hilburn purportedly summarizing the terms of their relationship.  In

---

[1]This includes Fashion Links, Inc.; Fashion Links, International; Fashion
Links, U.S.A.; and Fashion Links LLC.

this email, Welch stated,

> This letter is to 'confirm our understanding.' . . . [C]ommission goal is
> 5%-Danny understands that many programs will have to be @ 3-4%
> to make fly and is open, but would like to be part of the decision.  It is
> understood that Target will be at 2%.  It is also understood that while
> some commission is better than none at all, some deals are better to
> walk away from.

(Welch Ex. 3.)  Hilburn did not reply to this message.  According to Hilburn, the

parties agreed that Welch would be paid on a sliding scale like all other sales

representatives working for Chain Link Graphix.  The sliding scale was tied to the

profitability of sales.  Therefore, sales resulting in a higher profit would yield a

higher commission and sales with no profit would result in no commission.

Welch began working for Defendants in the spring of 2002.  His work on

two accounts, Maurice's and Target, is the subject of this lawsuit.

### D.   Maurice's

Welch sold approximately $5.7 million worth of Defendant's products to

Maurice's.  Chain Link issued him numerous checks as compensation and was

listed as the vendor of record on the orders.  Welch now brings this action

asserting that he was not paid the full 5% that he was contractually entitled to for

his sales to Maurice's.

Each time Welch received a check, it was accompanied by a statement

showing the order number, the amount billed to Maurice's, the cost of the

product, and the amount of commission paid to Welch.  Sometimes Welch did

4

receive 5%, and other times he received lower commissions.  Welch cashed each check as he was paid, but states that he consistently voiced complaints regarding the amount of his commissions.

In September 2003 Hilburn sent Welch a Memorandum of Understanding ("MOU") on behalf of Chain Link purporting to set forth the nature of the relationship between independent sales representatives and Chain Link.  This MOU included the profit-based sliding scale for commissions that Chain Link argues was the parties' agreement from the outset of their relationship.  Welch asserts that the MOU was a renegotiation of their original agreement necessitated by Fashion Links/Chain Link worsening financial conditions.  Welch marked up his version of the MOU, changing some of the commission percentages up, but he did not change all percentages to five percent.  Chain Link did not ask Welch to sign the MOU.

Welch terminated his employment relationship with Defendants in December 2003.  Chain Link continued to pay Welch commissions that he earned following his resignation.  For the most part the commissions were not at the 5% rate that Welch continued to demand.  Sometimes the sales reached the level of profit required to earn a five percent commission under the sliding scale, and Welch was paid five percent on those occasions.  Over the course of the business relationship, Chain Link paid P.I.M.L. a total of $106,000 for sales to Maurice's.

### E.    Target

Around the same time Welch negotiated his commission agreement regarding business with Maurice's, the parties also discussed a goal of selling apparel to Target.  Welch agreed to accept a commission of two percent for any sales made to Target.  This two percent agreement was memorialized in Welch's June 11, 2002 email summarizing his conversations with Hilburn.  (Welch Ex. 3.) Welch brings this action asserting that he was never paid commissions he earned through sales to Target.  The parties dispute who was employing Welch when he was developing the Target business.

### 1.    Fashion Links LLC and Fashion Links International

Fashion Links International is a Hong Kong-based company set up by Patrick Wong.  Davidson, McKelvey, and Fashion Links, LLC assert that they had no business interest with Fashion Links International.  Davidson and McKelvey received $100,000 per month for a total of $1.1 million from Fashion Links International for "consulting services."  (Davidson Dep. 59.)  No written or oral consulting agreements have been produced to prove their relationship as consultants.

### 2.    Amount of Sales to Target

Welch arranged for over $2 million worth of merchandise to be produced for Target.  The amount of completed sales to Target, however is in dispute.

6

Records produced by Target indicate that only $159,133 of sales were shipped to Target by Fashion Links International.  (Davis Decl. Ex. 5.)  These reports may not represent a complete listing of all Target business as it is unclear whether any sales were completed after the reports were issued.  Wire confirmations between Target and Fashion Links International evidence the possibility that greater amounts were sold.  (Welch Ex. 62.)

Chain Link paid Welch $11,000 for his work on Target.  Despite this, Chain Link maintains that it was under no obligation to pay Welch since he was not its employee.  According to Hilburn, he felt sorry for Welch that he wasn't getting paid and wrote an $11,000 check to Welch as a "advance."  (Hilburn Aff. ¶ 18.) Neither Fashion Links, LLC nor Fashion Links International ever paid any money to Welch for his work with Target.

## III.   PROCEDURAL HISTORY

Welch filed this lawsuit against Fashion Links, LLC, Chain Link Graphix, LLC, Chain Link Graphix, Inc., Edwin Davidson, Christopher Hilburn, and John McKelvey on June 24, 2004.  Welch asserts three claims against Defendants: Count I: Breach of Contract, Count II: Violation of Minn. Stat. § 181.145 and Count III: Quantum Meruit.  In their Answer, Defendants Fashion Links, LLC, Edwin Davidson, and John McKelvey ("Fashion Links Defendants") assert nine affirmative defenses: lack of personal jurisdiction; improper venue; the doctrines

of unclean hands, failure to mitigate damages, failure to state a claim upon which relief can be granted; and failure of consideration.  Defendants Chain Link Graphix, LLC, Chain Link Graphix, Inc., and Christopher Hilburn ("Chain Link Defendants") assert four affirmative defenses in their answer: lack of personal jurisdiction over Chain Link, Inc. and Christopher Hilburn; the doctrines of unclean hands, accord and satisfaction, and statute of frauds; and failure to state a claim upon which relief can be granted.  Through the present motion all defendants (collectively "Defendants") seek summary judgment on Welch's claims.

## IV.   ARGUMENTS OF THE PARTIES

### A.   Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be granted by the court if it can be shown that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The legal parameters of a summary judgment motion are well defined.  All evidence must be viewed in the light most favorable to the non-moving party, and summary judgment is appropriate whenever the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The non-moving party may not rest on mere

allegations or denials, but it must show through the presentation of evidence that specific facts exist creating a genuine issue for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986); <u>Krenik v. County of Le Sueur</u>, 47 F.3d 953, 957 (8th Cir. 1995). Finally, "the construction and effect of a contract is a question of law, unless an ambiguity exists." <u>Brookfield Trade Ctr., Inc. v. County of Ramsey</u>, 584 N.W.2d 390, 394 (Minn. 1998).

###  B.   Personal Jurisdiction

Hilburn and Chain Link, Inc. allege that they have had insufficient contacts with Minnesota to trigger personal jurisdiction in this case.

The Minnesota long-arm statute, Minn. Stat. § 543.19, Subd. 1(b), provides in relevant part that Minnesota courts may exercise personal jurisdiction over a party if the individual or entity transacts any business within that state. In order to comport with due process requirements of the Fourteenth Amendment to the United States Constitution, the defendant's interaction with the state must rise to the level of "minimum contacts" "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" <u>Int'l Shoe Co. v. State of Washington, Office of Unemployment Comp. & Placement</u>, 326 U.S. 310, 316 (1945) (citation omitted). The minimum contacts are sufficient to satisfy due process when the defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum state, thus invoking the benefits and

protection of its laws." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985). "Purposeful availment" means deliberately engaging in significant activities within a state or creating continuing obligations between the litigant and the residents of the forum . . ." Id. at 475-76.

The court, in determining the sufficiency of defendant's contacts, considers several factors: (1) the quantity of contacts within the forum state; (2) the nature and quality of contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience or inconvenience of the parties. Bell Paper Box, Inc. v. U.S. Kids, Inc., 22 F.3d 816, 819 (8th Cir. 1994). The first three considerations are "primary factors," whereas the latter two considerations are "secondary factors" in the inquiry. Northrup King Co. v. Compania Productora Semillas Algonderas Selectas, 51 F.3d 1383, 1388 (8th Cir. 1995) (citation omitted).

Chain Link Graphix, Inc. maintains that it has not had sufficient minimal contacts with the state of Minnesota, making any exercise of personal jurisdiction a violation of its procedural due process rights. Applying the Bell Paper factors, the Court agrees. Chain Link Graphix, Inc. is a Virginia corporation which operates to carry on local business only and has no sales outside the state of Virginia. Unlike Chain Link Graphix, LLC, Chain Link Graphix, Inc. never employed Welch. In fact, Chain Link Graphix, Inc. did not exist during most of Welch's employment as it

10

incorporated only one month before Welch resigned.  Hilburn testified that this company is a completely separate entity and never conducted any business with Welch.  Accordingly, Welch's claims against Chain Link Graphix, Inc. are dismissed for lack of personal jurisdiction.

Hilburn similarly alleges that his contacts with the state of Minnesota are insufficient and do not enable the Court to exercise jurisdiction over him.  According to Hilburn, his three or four business trips to Minnesota do not rise to the level of minimum contacts.  Relying on <u>Guinness Import Company v. Mark VII Distributors, Inc.</u>, Hilburn argues that maintaining a sales agent who sold its products within Minnesota is an insufficient basis to exercise personal jurisdiction.  971 F. Supp. 401, 407-410 (D. Minn. 1997).  However, this case is readily distinguishable because unlike the defendants in <u>Guinness</u>, Hilburn actually visited Minnesota on business trips and appears to maintain control over business decisions with the Minnesota customer.  Moreover, applying the facts at hand to the factors from <u>Bell Paper</u>, Hilburn's contacts with Minnesota are sufficient to satisfy due process.  Hilburn admits to visiting Minnesota for business purposes at least three times between 2002 and 2004.  These business trips were directly related to the current dispute.  Email evidence shows that Hilburn planned trips regarding business for Target, one of the claims at issue here.  Furthermore, convenience of the parties does not weigh heavily to one side or the other.

11

Because Welch was the sales representative for the Midwest, many of the key witnesses would be located in the Midwest, including some from Minnesota itself. Hilburn has purposefully availed himself of the laws and protections of the state of Minnesota when traveling and doing business within the state and this Court's exercise of personal jurisdiction over him is proper.

### C.   Count I: Breach of Contract

Welch alleges that Defendants breached his oral agreement with them by failing to pay him a five percent commission on all sales to Maurice's and by failing to pay him any commission for his sales to Target.

### 1.   Maurice's

Welch argues that he and Hilburn entered into a valid, enforceable oral agreement that Welch would be paid a flat five percent commission for sales to Maurice's. Chain Link and Hilburn argue that although there was an employment agreement, the evidence shows that the agreement was for a variable commission rate. Fashion Links asserts that any agreement made was between Chain Link and Welch, not Fashion Links.

The parties do not dispute the amount of sales to Maurice's. The only dispute is whether Welch's commission was five percent or variable.

An oral contract, to be enforceable, requires reasonably certain proof of the parties' intent on fundamental terms. Jensen v. Taco John's Int'l, Inc., 110 F.3d

525, 527 (8th Cir. 1997).  When substantial and necessary terms are left open for

negotiations, the purported contract is void.  Lupient v. Londo, No. A03-607, 2004

WL 117600, at *4 (Minn. Ct. App. Jan. 27, 2004) (unpublished).  Where the

evidence shows a lack of specifics and indicates merely preliminary negotiations,

no contract will be found.  Id.

Defendants contend that Welch has not offered sufficient evidence to create

a material factual dispute whether a contract for five percent commission was

formed.  Instead, according to Defendants, the commission was determined on a

case by case basis depending on the gross-profit margin resulting from the sale.

(Davis. Decl. Ex. 1, at 132.)

Construing all evidence in the light most favorable to Welch, the Court finds

that evidence of a material factual dispute regarding the parties' agreement exists.

The only writing purporting to summarize the agreement between the parties is a

summary email sent by Welch to Hilburn shortly after Welch's visit to Connecticut.

Welch stated, "Commission goal is 5%-Danny understands that many programs will

have to be at 3-4% to make fly and is open, but would like to be part of the

decision. . . .  It is also understood that while some commission is better than none

at all, some deals are better to walk away from."  (Welch Ex. 3.)  This statement

could be interpreted as consistent with Welch's contention that all contracts were

required to be at five percent and any nonconforming contract required Welch's

advance approval.  Although Welch accepted and cashed each of his paychecks at lower commission rates, Welch testified that he continuously voiced concerns regarding his rate of commissions.  Additionally, Welch's testimony reveals that he was paid on an ad hoc basis, with each check representing only a portion of his commission payments.  Thus, Welch could reasonably have believed that additional commission payments totaling five percent would follow.  Further, the Court notes that the Memorandum of Understanding which was issued after Welch completed most of his sales to Maurice's could be interpreted as an attempt to renegotiate the parties' original agreement and does not negate the material factual dispute regarding the terms of the original agreement.  Because the Court finds that ambiguity regarding the terms of the contract exist, summary judgment is inappropriate.

### 2. <u>Target</u>

Welch asserts a breach of contract claim for sales he completed with AMC, Target's buying entity.  The parties agree that Welch was to receive a two percent commission for all Target sales.  The only disputes regarding Welch's Target commissions are whether Welch has already been paid for all completed sales and who is responsible for any unpaid commissions.

### a. <u>Whether Welch is Owed Further Commission Payments</u>

Defendants argue that the evidence shows that Welch has been paid a

commission for all sales he completed with Target and the breach of contract claims relating to Target should be dismissed.  The Court finds that a material factual dispute exists as to whether Welch was paid for all completed sales to Target.

According to Target records, Target purchased only $159,133 worth of merchandise from Defendants.  (Davis Decl. Ex. 5.)  Because the applicable commission rate is two percent, Welch would have earned $3,182.66 for the Target orders.  Welch received one check from Chain Link for $11,000 for his Target work.  Thus, it would appear that Welch was fully compensated for his Target sales.  However, Welch testified that he believes the Target reporting is incorrect.  (Welch Dep. I. at 109-110; Welch Dep. II. at 26-27, 36-37.)  The report may be incomplete because it does not include shipments which occurred from February 2003 through June 2003.  (Welch. Dep. II. at 26-28.)  Furthermore, construing the facts in the light most favorable to Welch, the Target report may be incomplete in that it contained only the Mossimo brand of clothing.  Because Welch sold other brands of clothing to Target, a material factual dispute remains as to whether Welch was paid for all sales he completed with Target.  (Welch Dep. II. at 26-28, 36-38.)  Furthermore, wire transfer confirmations demonstrate payment of at least $700,000 by AMC to Fashion Links International.  (Welch Ex. 62.)  Moreover, Welch has put into evidence "commit sheets" sent by Target for $2.4 million in

goods ordered from Fashion Links.  (Taylor Aff. Ex. C, Ex. H.)  While the Court recognizes that "commit sheets" do not represent the amount of goods actually shipped to Target, they do create a material factual dispute as to whether Target purchased some amount of goods beyond the $159,133 currently in evidence. Accordingly, Welch has presented sufficient evidence to create a material factual dispute regarding whether he has been paid a commission for all sales he orchestrated with Target.

### b.    Who is Responsible for Any Commission Payments Due

As Welch has created a material factual dispute regarding whether he is owed additional commissions, the analysis then turns to who is responsible for any commission payments due.  To determine who is responsible for any payments, the Court must answer two questions: (1) which individuals/entities employed Welch and (2) which individuals/entities can be held liable for commission payments.

### i.    Who Employed Welch

Defendants argue that Welch was employed by one entity, Chain Link Graphix, LLC, for sales to Maurice's and that other Defendants should be dismissed. The Court finds that Welch has presented a material factual dispute regarding which entity or individuals employed him.  While each of his paychecks was issued by Chain Link Graphix, LLC, Welch was given business cards with the logo "Fashion Links."  Welch was assigned an email address at Fashion-Links.com.  Further,

16

Welch traveled to Fashion Links' headquarters in Connecticut, rather than Chain Link's headquarters in Virginia, for his initial interview.  As factual disputes remain, it is left for the jury to decide who employed Welch.

Both Fashion Links and Chain Link argue that even if some commission payments are due to Welch for Target sales, they not responsible for those payments as neither did any business with Target.

The Court finds that the evidence, viewed in the light most favorable to Welch, supports an inference that Welch was working for a nebulous entity called Fashion Links when he conducted Target business.   The following evidence reveals that individual partners of Fashion Links directly participated in the development of Target sales.  A wire transfer receipt shows that Fashion Links International received over $700,000 in payment from Target.  (Welch Ex. 62.) While Defendants claim that Fashion Links International had no business relationship with them, the evidence would allow a reasonable jury to find otherwise.  Fashion Links International paid Fashion Links over $1 million in "consulting fees."  (Welch Ex. 63.)  Yet neither Davidson nor McKelvey has provided any consulting contracts.  Furthermore, Hilburn wrote Welch a check for $11,000 for Target sales.  This check was drawn on Chain Link's account, not the account of Fashion Links International.  Hilburn calls this check an "advance" and maintains that he had no obligation to pay Welch.  (Hilburn Aff. ¶ 18.)

17

Additionally, Welch testified that after speaking with McKelvey and voicing

concerns over commission payments, McKelvey directed Hilburn to pay Welch.

(Welch Dep. I. at 51-52.)  All individual defendants were assigned email addresses

on the Fashion Links account.  Welch states that he was directed to use this email

for Target business.  (Welch Dep. II. at 15.)  Furthermore, all three individual

defendants were intimately involved in email discussions regarding the planning,

general business, and marketing decisions of Fashion Links.  (Welch Exs. 37-61.)

In another email Hilburn expresses concerns about delays in shipments to Target.

(Welch Ex. 13.)  Hilburn's involvement with the Target business is again evidenced

by his signing a license agreement with Target as a "Partner" of Fashion Links.

Thus, Welch has created a material factual dispute regarding which entities and

individual defendants employed him.

### ii.   Who Can be Held Liable for Commissions

Because this case involves a mixture of corporate entities, pre-incorporation

entities, and individuals, the Court must determine which parties properly remain

in the suit.

### a.   Pre-incorporation Promoter Liability

Welch argues that Hilburn, McKelvey and Davidson should be held liable as

the pre-incorporation promoters of Fashion Links, LLC.  Individuals may be held

liable under a theory of promoter liability.  Instances where several persons

18

associate to promote a business prior to incorporation, and enter into contracts

with third parties for the benefit of that business, can trigger promoter liability.

Promoter liability exists when a person enters into a contract for a non-existent

corporation.  Almac, Inc. v. JRH Dev., Inc., 391 N.W.2d 919, 924 (Minn. Ct. App.

1986).  Persons found to be promoters may be individually liable for all pre-

incorporation obligations.  Individual promoters remain liable for pre-incorporation

obligations even after the entity incorporates and assents to the contract.  State v.

Indus. Tool & Die Works, Inc., 21 N.W.2d 31, 37 (Minn. 1945); Almac, Inc. v. JRH

Dev., Inc., 391 N.W.2d 919, 924 (Minn. Ct. App. 1986).

Fashion Links, LLC was created in September 2003, yet Welch began his

employment relationship with Defendants in the spring of 2002.  Welch has

presented evidence that Hilburn, McKelvey, and Davidson entered into this

contract to benefit a corporation they intended to form called Fashion Links.  The

individuals' intention to form an entity is evidenced in an email string from Hilburn

to McKelvey where Hilburn states:

> It seems as though when we moved and I took Bert Van Gills off
> retainer he claims that he stopped the process of finishing all facets of
> the LLC Agreement.  We obviously knew we had no member
> agreement in place, however I did not know what else was needed,
> unlike the S Corp. filing.  Now having to get the ball rolling again
> means at least a 10 day period until we can get those things which
> the bank is requesting.

 (Welch Ex. 54.)  McKelvey responds to this message by telling Hilburn to let him

"handle" the attorneys in Virginia, because "they are making this way more complicated than it needs to be."  (Id.)  Evidence that Hilburn, McKelvey, and Davidson had employed an attorney to assist them with the organization process supports Welch's contention that the individuals were acting as pre-incorporation promoters.  Welch has presented email and other evidence of the Defendant's representations that the entities would soon merge into a corporation.  Whether the individual defendants actually held themselves out as the precursor to Fashion Links, LLC is a fact determination best made by a jury.  This evidence combined with the evidence that the individuals were working toward a Fashion Links entity with a "global structure" creates a material factual dispute as to whether Hilburn, McKelvey, and Davidson can be held individually liable as pre-incorporation promoters.

### b.   <u>Joint Venture/Joint Enterprise</u>

In the alternative, Welch argues that Hilburn, McKelvey, and Davidson created a joint venture and that each is individually liable for obligations of the joint venture.

The existence of a joint venture is ordinarily an issue of fact.  <u>Am. States Ins. Co. v. Ankrum</u>, 651 N.W.2d 513, 522 (Minn. Ct. App. 2002).  But where no competent evidence will support a finding of a joint venture, the district court may decide the issue as a matter of law.  <u>Duxbury v. Spex Foods, Inc.</u>, 681 N.W.2d

380, 390 (Minn. Ct. App. 2004) (citation omitted).

The Court finds that Welch has created a material factual dispute regarding whether Hilburn, McKelvey, and Davidson created a joint venture.  A joint venture under Minnesota law arises when: (1) each party has made a contribution of money, property, time, or skill to the enterprise, (2) the parties have joint proprietorship and control such that each party has a proprietary interest and the right of mutual control of the enterprise, (3) the parties have an express or implied agreement to share profits, but not necessarily losses, and (4) the parties have entered into an express or implied contract.  See Duxbury, 681 N.W.2d at 390.  To satisfy the joint proprietorship and control requirement, a party must show that the parties had a near equal right to control the business operations of the venture.  See Powell v. Trans Global Tours, Inc., 594 N.W.2d 252, 256 (Minn. Ct. App. 1999).  It is the right of control, not the exercise of control that determines liability.  Krengel v. Midwest Auto. Photo, Inc., 203 N.W.2d 841, 846-47 (Minn. 1973).

In this case, Welch has presented evidence creating a genuine issue of material fact as to whether a joint enterprise existed.  Email evidence exists establishing that Hilburn, McKelvey, and Davidson each invested significant time and energy to Fashion Links' strategic planning.  (Welch Exs. 37-61.)  McKelvey describes himself and Davidson as "directors" of Fashion Links and Hilburn and

Podar as "managing directors" of Fashion Links.  (Welch Ex. 48.)  In another

email, Hilburn expresses his intention to remove Chain Link from the "Fashion

Links umbrella."  (Welch Ex. 54.)  This statement could lead to an inference that

Hilburn considered Chain Link to be part of Fashion Links.  Additionally,

according to Welch, the individuals described themselves as "partners" during

Welch's initial meeting in Connecticut.  (Welch Dep. I. 68-72.)  Although Hilburn

denies having a business relationship with Fashion Links, he signed a trademark

licensing agreement with Target as "partner" of Fashion Links.  (Welch Ex. 18.)

The Court finds that this evidence is sufficient to create fact issues as to whether

Hilburn, McKelvey, and Davidson had joint proprietorship or control over Fashion

Links, whether the parties had an agreement to share profits, and whether they

entered into an implied contract.  Finally, the Court is not convinced that the

Duxbury case precludes a finding of a joint venture in this case.  In Duxbury the

court concluded that no joint venture can be found "if the amount that one party

receives is fixed, regardless of the success or failure of the enterprise."  Duxbury,

681 N.W.2d at 390.  Construing all evidence in the light most favorable to Welch,

however, the Court does not find that adequate evidence of a flat consulting

arrangement exists.  Neither Davidson nor McKelvey has provided the Court with

any consulting contracts that would guarantee them payment regardless of the

success or failure of the enterprise.  Furthermore, Davidson and McKelvey's

assertion that they were merely paid consultants is undermined by emails where they refer to themselves as "directors" of Fashion Links.  The Court finds that Welch has presented competent evidence to support the finding of a joint venture and the ultimate liability determination will be left for a jury to decide.

### iii.   **Fashion Links, LLC's liability**

Since Fashion Links, LLC was not in existence at the time Welch's employment agreement was negotiated, it cannot be held liable as a party to the agreement.  However, an entity can become liable on a promoter's contract once the entity assents to the contract.  Almac, Inc. v. JRH Dev., Inc., 391 N.W.2d 919, 924 (Minn. Ct. App. 1986).  Welch has not provided any evidence upon which to base a finding that Fashion Links, LLC may have adopted, ratified, or assented to his employment agreement after its creation in September 2003.

Welch contends that "there is substantial evidence supporting PIML's claims against the individual Defendants for promoter liability, and against Fashion Links, LLC as their successor . . ."  (Plaintiff's Mem. in Support of Summ. J. 30.)

The liability of a successor corporation for acts arising before it became a corporation is called "transferee liability" in Minnesota.  Welch has not plead the necessary elements of transferee liability in order to impose liability for any breach on Fashion Link, LLC.  Minnesota statutory law provides for transferee liability, but "only to the extent provided in the contract or agreement between the

transferee and the transferor." Minn. Stat. § 302A661.  Welch's complaint does not allege that Fashion Links, LLC agreed to assume any liability of the alleged joint venture, Fashion Links.

In four circumstances the court will make an exception to the statutory rule regarding transferee liability: (1) when the successor corporation expressly or impliedly agreed to assume such liabilities; (2) when the acquisition amounts to a merger of the corporations; (3) when the successor corporation is merely a continuation of the purchased corporation; and (4) when the purpose of the transaction is to fraudulently escape liability for debts.  Niccum v. Hydra Tool Corp., 438 N.W.2d 96, 98 (Minn. 1989).  The Court finds that Welch has not demonstrated facts sufficient to support a finding of successor liability in this case. The parties have not provided Fashion Links, LLC's articles of incorporation stating which obligations Fashion Links, LLC intended to assume.  The creation of Fashion Links, LLC, cannot be said to amount to a merger of the corporations since Hilburn, one of the principal partners in the alleged joint venture, was not involved in the formation of Fashion Links, LLC.  Additionally, the entity which paid Welch, Chain Link, is not part of Fashion Links, LLC.  Thus, Fashion Links, LLC cannot be said to be a mere continuation of the previous entity.  Finally, Welch has presented no evidence of fraud sufficient to invoke successor liability. Accordingly, Fashion Links, LLC's Motion for summary judgment is granted as

Welch has not presented sufficient evidence to establish that Fashion Links, LLC entered into any agreements with Welch.

### D.      **Count II: Nonpayment of Commissions Under Minn. Stat. § 181.145**

Minnesota Statute § 181.145, Subd. 2(c), provides that when a commission salesperson resigns, the employer must pay the "commissions earned through the last day of employment on demand no later than six working days after the salesperson's last day of work," or face liability for statutory penalties in addition to the commissions themselves.

As set forth above, Welch has created a material factual dispute regarding whether he is owed additional commissions.  Accordingly, his claims under Minn. Stat. § 181.145 for statutory penalties resulting from the failure to pay commissions due survive summary judgment.

### E.      **Count III: Quantum Meruit/Unjust Enrichment**

Welch claims that he is equitably entitled to fair compensation for the value of the benefit it has bestowed upon Defendants.  (Rubenstein Aff. Ex. H.)  To establish a claim for unjust enrichment, a plaintiff must show that another party knowingly received something of value to which it was not entitled, under circumstances that establish that it would be unjust for that person to retain the benefit.  Schumacher v. Schumacher, 627 N.W.2d 725, 729 (Minn. Ct. App. 2001).

An action for unjust enrichment "may be founded upon failure of consideration, fraud, or mistake, or situations where it would be morally wrong for one party to enrich himself at the expense of another." Holman v. CPT Corp., 457 N.W.2d 740, 745 (Minn. App. 1990).

"Equitable relief cannot be granted where the right of the parties are governed by a valid contract." United States Fire Ins. v. Minnesota State Zoological Bd., 307 N.W.2d 490, 497 (Minn. 1981) (citation omitted). However, a plaintiff may submit alternative theories of breach of contract and unjust enrichment when the contract is ambiguous and it is possible that the jury may find that no express contract existed. Schimmelpfenning v. Gaedke, 27 N.W.2d 416, 420 (Minn. 1947).

In this case, summary judgment is inappropriate for Welch's claim of quantum meruit. Because it is possible that a jury could find that no contract exists, it is proper for Welch to plead unjust enrichment in the alternative. Welch has shown that he provided the value of his services and that Defendants knowingly received such services. Therefore, if a jury found that no contract between Welch and Defendants exists, Welch could argue that Defendants have been unjustly enriched.

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.      Defendants Chain Link Graphix, LLC, Chain Link Graphix, Inc., and

Christopher Hilburn's Motion for Summary Judgment [Docket No. 47]

is **GRANTED IN PART** and **DENIED IN PART** as follows:

   a.      All counts against Defendant Chain Link Graphix, Inc. are
           **DISMISSED** with prejudice.
   b.      All counts against Defendants Chain Link Graphix, LLC and
           Christopher Hilburn remain.

2.      Defendants Fashion Links, LLC, Edwin W. Davidson, and John D.

McKelvey's Motion for Summary Judgment [Docket No. 55] is

**GRANTED IN PART** and **DENIED IN PART** as follows:

   a.      All counts against Defendant Fashion Links, LLC are
           **DISMISSED** with prejudice.
   b.      All counts against Defendants Edwin Davidson and John
           McKelvey remain.

Dated: March 23, 2006                     s / Michael J. Davis
                                          Judge Michael J. Davis
                                          United States District Court